UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| OBAN US, LLC,<br>    *Plaintiff*,<br>*v.*<br>NAUTILUS, INC. and<br>SPORTS BEAT, INC.,<br>    *Defendants*. | Civil No. 3:13cv1076 (JBA)<br><br>June 23, 2014 |

Plaintiff Oban US, LLC ("Oban"), manufacturer of a fitness heart rate monitor, alleges that Defendant Sports Beat, Inc. ("Sports Beat") has created an imitation product that is a virtual copycat of the Oban monitor.  Sports Beat sells its product under the brand name "Bowflex" through a license from the Bowflex brand's owner, Defendant Nautilus, Inc. ("Nautilus").  Oban brings claims against both Sports Beat and Nautilus for copyright, trademark, and trade dress infringement and unfair competition under the Lanham Act and the statutes of unspecified states.[1]  Nautilus moves [Doc. # 22] to dismiss the Amended Complaint, contending that Plaintiff has failed to plausibly state a claim of contributory trademark infringement and vicarious copyright liability or unfair competition arising from its licensing agreement with Sports Beat.  For the reasons that follow, Defendant Nautilus' motion is granted and all claims against it are dismissed.

---

[1] Plaintiff asserts claims of trademark infringement (Count One), unfair trade practices and unfair competition under the Lanham Act, 15 U.S.C. 1125 § 43(a) and "the various state unfair competition acts of the states wherein their sales have been made" (Count Two), copyright infringement (Count Three), and trade dress infringement under the Lanham Act (Count Four), seeking damages and injunctive relief.

I.      **Facts Alleged**

Oban is the manufacturer of electronic products, including a fitness heart rate monitor system that it markets under the trade name "60beat," consisting of three elements: a chest strap, a wireless receiver compatible with a smart phone, and software to translate data from the chest strap into displayable information for the smart phone. (Am. Compl. [Doc # 21] ¶ 4.)  Oban has pending applications with the United States Patent Office for patent protection of its product and for copyright protection for original images and documents used in its written materials and the software used to interpret the electrical signal from the monitor.  (*Id.* ¶¶ 4, 7.)  It already has registered the trademark "60beat." (*Id.* ¶ 5.)

Oban alleges that Defendant Sports Beat sells a heart rate monitor that is an "imitation of, and in all material aspects and image, identical to the 60beat monitor" and that its manual references "60beat" eight times and directs its customers to Oban's website for technical support.  (*Id.* ¶ 10)  Sports Beat sells its product under the brand name "Bowflex" through a license from Defendant Nautilus, the owner of that brand.  (*Id.* ¶ 8.)

On November 1, 2012, Oban notified Nautilus of Sports Beat's infringement. (*Id.* ¶ 21.)  By letter, Nautilus' general counsel responded that until receiving this notice from Oban, Nautilis was unaware of Sports Beat's infringement and "had no role in the sourcing or sale of any product by Sports Beat." (Feb. 22, 2013 Ltr. Nautilus to Oban Ex. 8 to Am. Comp.)  Nautilus further responded that it had terminated its contract with Sports Beat as of December 31, 2012, as the earliest date the agreement could have been

terminated,[2] and had directed Sports Beat to destroy all Bowflex-branded products without any "sell-off period," meaning that Sports Beat could not sell its inventory of Bowflex products produced before the termination.  (Feb. 22, 2013 Ltr. Nautilus to Oban Ex. 8 to Am. Comp.; *see also* Am. Compl. ¶ 23.)  Plaintiff contends that despite Nautilus' representations, Sports Beat continues to sell Bowflex products and that Nautilus has failed to respond to Plaintiff's demands to take further action against Sports Beat.  (Am. Compl. ¶ 23.)

The Amended Complaint does not allege that Nautilus had any direct involvement in the manufacture of the infringing Sports Beat product.  Rather it alleges that "[a]ssuming industry standards for the Nautilus' licensing agreement with Sports Beat, Nautilus had the right to . . . approve the product that would be using the Bowflex brand, approve all selling materials where the Bowflex brand is used, approve all images where the Bowflex brand is used, approve all packaging and instruction book materials associated with the Bowflex brand and approve all trade show uses of the Bowflex brand." (*Id.* ¶ 18.)  Thus, Plaintiff alleges Nautilus "knew or should have known and had an affirmative obligation to know:" (a) "What product was being sold under its Bowflex brand;" (b) "How the Bowflex product was being sold;" (c) "Where the Bowflex product came from;" (d) "Whether that product belonged to another;" and (3) "That its Bowflex brand was being use to deceive the public."  (*Id.* ¶ 17.)

---

[2] The parties have not submitted the referenced Nautilus-Sports Beat agreement.

II.     Discussion³

    A.     **Trademark Infringement (Count One)**

Oban claims that Nautilus is liable for contributory infringement of its trademark, 60beat, but not direct infringement. (Pl's Opp'n [Doc. # 23] at 1.) Nautilus maintains that its status as a licensor of its Bowflex brand to Sports Beat fails to show sufficient control over Sports Beat to plausibly allege contributory infringement.

Under the test first established by the Supreme Court in *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844 (1982), "[t]o be liable for contributory trademark infringement, a defendant must have (1) 'intentionally induced' the primary infringer to infringe, or (2) continued to supply an infringing product to an infringer with knowledge that the infringer is mislabeling the particular product supplied." *Kelly-Brown v. Winfrey*, 717 F.3d 295, 314 (2d Cir. 2013) (quoting *Perfect 10, Inc. v. Visa Int'l Serv. Ass'n,* 494 F.3d 788, 807 (9th Cir. 2007)).⁴

---

    ³ To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). Detailed allegations are not required but a claim will be found facially plausible only if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* However, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (alterations in original).

    ⁴ Plaintiff's theory of liability differs for its copyright and trademark claims, asserting a theory of vicarious copyright infringement and contributory trademark infringement. Even if the theories of liability were the same for the trademark and copyright claims, the Supreme Court has cautioned that "[g]iven the fundamental differences between copyright law and trademark law, in [a] copyright case we do not

Oban does not discuss any distinction between claims of contributory infringement involving a physical product and those in which an alleged contributory infringer provides a service, or, as here, a license. "[W]ithout deciding that *Inwood's* test for contributory trademark infringement governs" in both instances, the Second Circuit has noted that other courts have held that a plaintiff must show that a service provider or licensor had "'[d]irect control and monitoring of the instrumentality used by a third party to infringe the plaintiff's mark.'" *Tiffany (NJ) Inc. v. eBay Inc.*, 600 F.3d 93, 105 (2d Cir. 2010) (quoting *Lockheed Martin Corp. v. Network Solutions, Inc.,* 194 F.3d 980, 984 (9th Cir. 1999)). "A number of courts in this [Circuit] have applied *Inwood* in the service-provider context" applying THE test established by the Ninth Circuit in *Lockheed Martin Corp.  See Nomination Di Antonio E Paolo Gensini S.N.C. v. H.E.R. Accessories Ltd.*, No. 07cv6959 (DAB), 2010 WL 4968072, at *3 (S.D.N.Y. Dec. 6, 2010).

Nautilus contends that no legally viable claim against it is alleged in the Amended Complaint, because (1) its control over its own brand as a licensor did not impose upon it a duty to control its licensee's use of a third-party's trademark; (2) the Bowflex brand was not "the instrument of infringement;" and (3) there is no allegation that Nautilus approved any product made by Sports Beat after it became aware of the infringement.[5] (Def.'s Mem. Supp. [Doc. # 22-1] at 5–6.)  The Amended Complaint makes clear that

---

look to the standard for contributory infringement . . . which was crafted for application in trademark cases." *Sony Corp. of Am. v. Universal City Studios, Inc.*, 464 U.S. 417, 439 n.19 (1984). "The tests for secondary trademark infringement are even more difficult to satisfy than those required to find secondary copyright infringement." *Perfect 10*, 494 F.3d at 806.

[5] At oral argument, Plaintiff confirmed that it does not advance a theory of intentional inducement.

Plaintiff's theory of contributory infringement is based on Nautilus's ability as a licensor of the Bowflex brand to approve the Sports Beat product using its brand (*see* Am. Compl. ¶ 18), which it claims Nautilus was obligated to exercise in order to avoid abandonment under the Lanham Act, under which a mark may be canceled if the registrant "does not control, or is not able legitimately to exercise control over, the use of such mark." 15 U.S.C. § 1064(c).

Oban reasons that in the process of taking steps to protect its trademark against abandonment, Nautilus "logically" must have taken steps "to know how Sports Beat was using it" and thus "knew or should have known what product Sports Beat was selling; where and how Sports Beat obtained that product; how it was being sold including its instructions, etc. Nautilus knew or should have known that Sports Beat was misusing the 60beat trademark, and infringing upon Oban's trade dress and copyright." (Pl.'s Opp'n at 2–3.)

The flaw in Plaintiff's legal theory is that Nautilus' duty to monitor the use of its own mark does not impose on it a duty to monitor its licensee's infringement of a third party's mark.  The sole consequence provided by the Lanham Act for failing to exercise control over the use of a licensed mark is the potential loss of the rights associated with that trademark.  *See* 15 U.S.C. § 1064(c).  Plaintiff references no case law suggesting that a trademark owner's failure to fulfill this requirement under the Lanham Act can impose affirmative liability on it for infringement by its licensees.  The Eleventh Circuit addressed a similar issue regarding the interrelation of the abandonment provisions of the Lanham Act and secondary liability for trademark infringement in *Mini Maid Servs. Co. v. Maid Brigade Sys., Inc.*, 967 F.2d 1516, 1520 (11th Cir. 1992), a trademark suit seeking to hold a

6

franchisor secondarily liable for the trademark infringement of its franchisee. The court held that "the licensor's duty to control a licensee's use of *the licensor's own trademark* cannot be blindly converted into a duty to prevent a licensee's misuse of *another party's trademark*. Such a wholesale conversion would impose responsibility upon a franchisor not for failing to maintain the integrity of its own trademark, but for failing to prevent another entity's violation of the law."[6] *Id.* Because Plaintiff has not alleged any facts beyond Nautilus' status as a licensor of its mark to Sports Beat to support a theory of contributory infringement, it has not stated a viable claim.

The duty Plaintiff alleges arising from Nautilus' licensing contract with Sports Beat, giving it a right to monitor Sports Beat's use of its Bowflex trademark, is a duty different from a duty to prevent infringement of a third-party's mark. Because trademarks were historically used to identify goods that had been manufactured by a

---

[6] In *Gibson Guitar Corp. v. Viacom Int'l Inc.*, No. 12-10870 (AJW), 2013 WL 2155309, at *4 (C.D. Cal. May 17, 2013), the district court considered and rejected a theory of infringement very similar to that advanced by Oban in which the defendant, Viacom, licensed its trademark for SPONGEBOB to JHS, which sold musical instruments using the mark. The plaintiff alleged that because JHS infringed one of its marks, Viacom, as a licensor to JHS, was liable because it had the right "to monitor and control the quality and distribution of . . . Products containing the SPONGEBOB SQUAREPANTS and NICKELODEON trademarks." *Id.* at *1. The court held that even if Viacom's monitoring as a licensor provided it with actual or constructive knowledge of infringement, "it must also have had the requisite control over the infringement in order to be held liable for contributory infringement." *Id.* at *4. Such control was lacking, because "Viacom's licensing of the SPONGEBOB mark to JHS is not the instrument of infringement . . . . Viacom could bar JHS from selling the SpongeBob SquarePants Flying V Ukulele, which would 'have the practical effect of stopping or reducing the infringing activity,' but would not prevent JHS from designing and selling a Flying V Ukulele without the SPONGEBOB mark, since the two marks are independent." *Id.* at *5 (quoting *Perfect 10,* 494 F.3d at 807) (internal citations omitted).

particular person or business, "a number of early courts . . . conclude[d] that the owner of a trademark could not license others to use the mark without destroying the significance of the designation as an indication of source." Restatement (Third) of Unfair Competition § 33 cmt. a (1995). This "narrow conception of trademarks as indications of physical source was eventually replaced by a recognition that trademarks may signify other connections between goods bearing the mark and the trademark owner, including the trademark owner's approval or sponsorship of the goods" and "[t]rademarks thus came to be understood as indications of consistent and predictable quality assured through the trademark owner's control over the use of the designation." *Id.*

Given the signal of quality conveyed by a trademark, the Lanham Act prohibits uncontrolled or "naked" licensing in which "a trademark owner fails to exercise reasonable control over the use of the mark by a licensee." *Id.* cmt. b. "The rationale for this requirement is that marks are treated by purchasers as an indication that the trademark owner is associated with the product." *Kentucky Fried Chicken Corp. v. Diversified Packaging Corp.*, 549 F.2d 368, 387 (5th Cir. 1977). "Customers rely upon the owner's reputation when they select the trademarked goods," *id.*, and "[t]he purpose of the quality-control requirement is to prevent the public deception that would ensue from variant quality standards under the same mark or dress." *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1121 (5th Cir. 1991), *aff'd* 505 U.S. 763 (1992). Without this requirement "the public [would] be deprived of its most effective protection against misleading uses of a trademark," *Dawn Donut Co. v. Hart's Food Stores, Inc.*, 267 F.2d 358, 367 (2d Cir. 1959).

This duty, however, does not necessarily require a licensor to "ensure 'high quality' goods" are being produced by its licensee. *Eva's Bridal Ltd. v. Halanick Enterprises, Inc.*, 639 F.3d 788, 790 (7th Cir. 2011). For example, "'Kentucky Fried Chicken' is a valid mark though neither that chain nor any other fast-food franchise receives a star (or even a mention) in the *Guide Michelin*." *Id.* (internal citation omitted). Instead, the "supervision required for [this] trademark license is the sort that produces . . . . 'consistent and predictable quality.'" *Id.* (quoting Restatement § 33 cmt. b). Thus, in fulfilling its duty to monitor the use of its mark under the Lanham Act, Nautilus would be focused on whether the quality of the product manufactured by Sports Beat was consistent with other products manufactured under the Bowflex name, not whether it infringed another company's marks.[7]

Additionally, the level of monitoring that is required by a licensor varies with the circumstances, *see id.* at 791 ("How much authority is enough can't be answered generally; the nature of the business, and customers' expectations, both matter."), and "there need not be formal quality control where 'the particular circumstances of the licensing arrangement [indicate] that the public will not be deceived,'" *Moore Bus. Forms, Inc. v. Ryu*, 960 F.2d 486, 489 (5th Cir. 1992) (quoting *Taco Cabana*, 932 F.2d at 1121). Oban has not pleaded any facts to suggest the level of monitoring that Oban was required to exercise in these circumstances nor does Oban plead any facts to show how and whether Nautilus actually fulfilled its obligations under the Lanham Act to exercise control.

---

[7] Notably, at oral argument, Oban acknowledged that even if Nautilus had inspected Sport Beat's product, it would not necessarily have known of the infringement.

What is absent from Plaintiff's Amended Complaint is any factual allegation that Nautilus had "direct control and monitoring" of the instrumentality of infringement, i.e., that it "participat[ed] in the development, promotion and sale of the counterfeit" product manufactured by Sports Beat and did so with knowledge of the infringement. *Nomination*, 2010 WL 4968072, at \*4; *see also Mini Maid Servs. Co.*, 967 F.2d at 1522 ("[W]e hold that the franchisor may be held accountable only if it intentionally induced its franchisees to infringe another's trademark or if it knowingly participated in a scheme of trademark infringement carried out by its franchisees.").

Oban has not alleged this level of involvement by Nautilus and has not pled any facts to plausibly suggest that Nautilus was aware of the infringement before Oban's letter of November 1, 2012.  (*See* Am. Comp. ¶ 21.)  Nor has Oban alleged facts showing that Nautilus supplied its mark "to one whom it knows or has reason to know is engaging in trademark infringement." *Nomination*, 2010 WL 4968072, at \*9 (quoting *Inwood Labs*, 456 U.S. at 854).  Although Oban alleges that the infringing products continued to be sold under the Bowflex brand (*see id.* ¶ 23), it does not contend that this was done with Nautilus' knowledge or approval.  *See Nomination*, 2010 WL 4968072, at \*6 ("Plaintiffs' allegations that the Licensor Defendants continued to supply their services after this notice are conclusory under *Iqbal*.  Not one of the license agreements and approval letters annexed to the Third Amended Complaint is dated after December 2005, when Plaintiffs notified at least some Licensor Defendants of the infringement.  Nor do Plaintiffs allege that any of the license agreements were renewed or extended after the Licensor Defendants were notified of the infringement, or that the Licensor Defendants approved any additional product samples after that date.").

10

Because Nautilus' trademark license for Bowflex to Sports Beat is not alleged to confer control and responsibility for Sports Beat's manufacture and sale of its heart monitoring product nor authorization for continued use of its mark after knowledge of infringement, the Amended Complaint does not plausibly allege contributory infringement and Nautilus' motion to dismiss is therefore granted as to Count One.

### B.   Copyright Infringement (Count Three)

As a threshold matter, Nautilus contends that Oban's copyright infringement claim fails because the Amended Complaint does not allege registration of Oban's copyright, only that its application was pending with the Copyright Office.  (*See* Am. Compl. ¶ 7.)  The Copyright Act provides that "no civil action for infringement of the copyright in any United States work shall be instituted until preregistration[8] or registration of the copyright claim has been made in accordance with this title."  17 U.S.C. § 411(a).  There is a split of authority regarding whether registration is required or whether submitting an application to the Copyright Office suffices and the Second Circuit has recently declined to resolve this issue.  *See Psihoyos v. John Wiley & Sons, Inc.*,

---

[8] Preregistration is distinct from submitting an application and fee to the Copyright Office and is not applicable in this case.  Preregistration was established by the Artists' Rights and Theft Prevention Act of 2005 and required the Copyright Registrar to develop regulations for preregistration available for "any work that is in a class of works that the Register determines has had a history of infringement prior to authorized commercial distribution."  17 U.S.C. § 408(f)(2).  This "new status is not widely available to all copyright owners" and instead is only available to "works such as movies and music [that] can be pirated in their late production phases, before registration of the final work," a "concern [that] has been exacerbated by internet distribution of these pirated works."  Rita Marie Cain, *Timing Is Everything: Copyright Registration and Preregistration*, 88 J. Pat. & Trademark Off. Soc'y 381, 388 (2006); *see also* 2 Nimmer on Copyright § 7.16[C][2][c][4].

— F.3d —, 2014 WL 1327937, at *4 (2d Cir. Apr. 4, 2014) (noting that "the Federal Courts of Appeals are divided over whether a pending application satisfies § 411(a)'s requirement of copyright registration as a precondition to instituting an infringement action" but holding that "[w]e need not resolve the dispute or otherwise embroil ourselves in this circuit split").

Some courts in this Circuit that have addressed the issue have followed the so-called registration approach and "require that a plaintiff either hold a valid copyright registration or have applied and been refused a registration as a prerequisite to filing a civil claim." *See Muench Photography, Inc. v. Houghton Mifflin Harcourt Pub. Co.*, No. 09cv2669 (LAP), 2012 WL 1021535, at *2 (S.D.N.Y. Mar. 26, 2012) (collecting district court cases); *RBC Nice Bearings, Inc. v. Peer Bearing Co.*, No. 3:06-CV-1380 (VLB), 2009 WL 3642769, at *4 (D. Conn. Oct. 27, 2009).

Other courts both within and outside this Circuit have rejected the "registration approach" and instead followed the "application approach" under which a party can bring a copyright infringement claim after an application has been submitted to the Copyright Office and before registration is acted upon. *See, e.g., Apple Barrel Prods., Inc. v. Beard*, 730 F.2d 384, 386 (5th Cir. 1984); *Well-Made Toy Mfg. Corp. v. Goffa Int'l Corp.*, 210 F. Supp. 2d 147, 157 (E.D.N.Y. 2002); *Havens v. Time Warner, Inc.*, 896 F. Supp. 141, 142 (S.D.N.Y. 1995). This approach recognizes that 17 U.S.C. § 411(a) makes registration a prerequisite to suit, but that 17 U.S.C. § 410(d) provides that the "effective date of a copyright registration is the day on which an application, deposit, and fee, which are later determined by the Register of Copyrights or by a court of competent jurisdiction to be acceptable for registration, have all been received in the Copyright Office." Since a "court

of competent jurisdiction" can adjudicate the adequacy of the submission to the Copyright Office," these courts have concluded that the submission of an application is sufficient to bring suit.  *See* 2 Nimmer on Copyright § 7.16[B][3][b].

Further, § 411(a) provides that even if "registration has been refused, the applicant is entitled to institute an action for infringement."  "As the leading treatise on copyright explains, the registration approach thus creates a strange scheme: '[G]iven that the claimant . . . will ultimately be allowed to proceed regardless of how the Copyright Office treats the application, it makes little sense to create a period of 'legal limbo' in which suit is barred."  *Cosmetic Ideas, Inc. v. IAC/InteractiveCorp*, 606 F.3d 612, 620 (9th Cir. 2010) (quoting 2 Nimmer on Copyright § 7.16[B][1][a][i] (alterations in original)).

The application approach "avoids this legal limbo—and avoids prolonging the period of infringement—by allowing a litigant to proceed with an infringement suit as soon as he has taken all of the necessary steps to register the copyright at issue."  *Id.*  These courts have concluded that the application approach "best effectuate[s] the interests of justice and promote[s] judicial economy."  *International Kitchen Exhaust Cleaning Ass'n v. Power Washers of N. Am.*, 81 F. Supp. 2d 70, 72 (D.D.C. 2000).  Indeed, even some courts following the registration approach have noted that it "leads to an inefficient and peculiar result."  *See, e.g., Ryan v. Carl Corp.*, No. 97cv3873 (FMS), 1998 WL 320817, at *3 (N.D. Cal. June 15, 1998).  As discussed below, the Court concludes that Plaintiff has not stated a plausible copyright infringement claim, and it need not determine whether to adopt the registration or application approach, but would be inclined to adopt the application approach, which courts and scholars have recognized as being more efficient and better serving the interest of justice.

No matter which approach is used, however, Plaintiff's claim of vicarious copyright infringement is not legally viable. Oban advances only a theory of vicarious copyright infringement. (Pl.'s Opp'n at 4–5.) "Vicarious infringement is a concept related to, but distinct from, contributory infringement. Whereas contributory infringement is based on tort-law principles of enterprise liability and imputed intent, vicarious infringement's roots lie in the agency principles of *respondeat superior*." *Perfect 10*, 494 F.3d at 802. To state a claim of vicarious copyright infringement, Oban must allege that Nautilus had the "right and ability to supervise" the infringing conduct and a direct financial interest in the infringing activity. *Softel, Inc. v. Dragon Med. & Scientific Commc'ns, Inc.*, 118 F.3d 955, 971 (2d Cir. 1997) (quoting *Shapiro, Bernstein & Co. v. H.L. Green Co.,* 316 F.2d 304, 307 (2d Cir. 1963) (affirming dismissal of vicarious copyright infringement claim where "[t]he only evidence . . . of [the defendant's] supervisory capacities and financial interests was that [the defendant] was the president of [infringing company] and a shareholder").

Oban contends that "Nautilus benefited from the Bowflex license both directly" and indirectly "as a means to extend [its] brand awareness" and "had the power to exercise a right to stop Sports Beat from infringing." (Pl.'s Opp'n at 5.) However, as discussed above, even if the licensing relationship between Nautilus and Sports Beat gave Nautilus the right and ability to control its mark, this relationship is not akin to agent and principal and does not imply that Nautilus was necessarily "profiting from direct infringement while declining to exercise a right to stop or limit it." *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005) (citing *Shapiro, Bernstein & Co.,* 316 F.2d at 307)).

By contrast, in *Shapiro, Bernstein & Co.*, the defendant department store was found vicariously liable for the directly infringing sales of pirated records manufactured and sold by its retailing concessionaire where it received a proportionate share of the gross proceeds of all sales and had the "unreviewable discretion" to discharge the infringer's employees for not following its rules and policies.  316 F.2d at 308.  The Second Circuit concluded that the department store's "relationship to its infringing licensee, as well as its strong concern for the financial success of the phonograph record concession, renders it liable for the unauthorized sales of the 'bootleg' records."  *Id.*  Because the department store "retained the ultimate right of supervision over the conduct of the record concession and its employees," the relationship between the parties was akin to employer-employee and vicarious infringement liability applied.  *Id.*

In *Perfect 10*, the Ninth Circuit held that credit card companies were not vicariously liable for processing payments on websites selling infringing photographs, although the credit card companies' rules and regulations permitted them to require member merchants to cease illegal activity and they could have refused to process payments on this basis, which would have had "some indirect effect on the infringing activity."  *Perfect 10*, 494 F.3d at 805.  In order for "vicarious liability to attach, however, the defendant must have the right and ability to *supervise* and *control* the infringement, not just affect it."  *Id.* (emphasis in original).  Likewise, here Nautilus had the ability to revoke Sports Beat's right to use the Bowflex brand name but there is no allegation that it could have prevented Sports Beat from creating a product and associated materials that were an imitation of "60beat" or that without the Bowflex label Sports Beat would not have been able to sell the same monitor.  Under its licensing agreement, Nautilus could

prevent the Bowflex name from being attached to this imitation product, but that has only an indirect impact on Sports Beat's conduct and does not imply an ability to supervisor and control the actual infringement. Accordingly, Nautilus' motion to dismiss is granted as to Count Three.

### C. Trade Dress Infringement (Count Four)

The Lanham Act "extends protection to a product's 'trade dress'—the total image of a good as defined by its overall composition and design, including size, shape, color, texture, and graphics." *Coach Leatherware Co., Inc. v. AnnTaylor, Inc.*, 933 F.2d 162, 168 (2d Cir. 1991). "To plead a claim of trade dress infringement involving the appearance of a product, [a plaintiff] must allege that (1) the claimed trade dress is non-functional; (2) the claimed trade dress has secondary meaning; and (3) there is a likelihood of confusion between the plaintiff's good and the defendant's." *Sherwood 48 Associates v. Sony Corp. of Am.*, 76 F. App'x 389, 391 (2d Cir. 2003).

Oban alleges that Sports Beat has intentionally misused its trade dress by using "images from the Plaintiff's product in marketing its copycat product" and that Nautilus has allowed such use. (Am. Compl. ¶¶ 33–35.) Even if Plaintiff could establish that Nautilus was indirectly liable for this infringement, it has failed to offer any description of the asserted trade dress, only attaching to the Amended Complaint images of the respective products. Oban declined to articulate the elements of its trade dress claim, explaining that "[r]ather than trying to verbally describe the similarities," it "attached pictures which show how much the Bowflex product matched the 60beat product. What could be more specific?" (Pl.'s Opp'n at 6.)

The answer to Plaintiff's question is that this approach fails as overbroad. *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 380 (2d Cir. 1997). The Second Circuit has "exercised particular caution when extending protection to product designs" out of concern that "granting trade dress protection to an ordinary product design would create a monopoly in the goods themselves." *Id.* (internal quotation marks omitted). Thus, "the party seeking protection must . . . be able to point to the elements and features that distinguish its trade dress" and "[t]he identification of design elements that compose the asserted trade dress will thus assist in winnowing out claims that are overbroad as a matter of law," *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 117 (2d Cir. 2001), because "[w]ithout such a precise expression of the character and scope of the claimed trade dress, litigation will be difficult, as courts will be unable to evaluate how unique and unexpected the design elements are in the relevant market. Courts will also be unable to shape narrowly-tailored relief if they do not know what distinctive combination of ingredients deserves protection. Moreover, a plaintiff's inability to explain to a court exactly which aspects of its product design(s) merit protection may indicate that its claim is pitched at an improper level of generality, i.e., the claimant seeks protection for an unprotectable style, theme or idea." *Landscape Forms, Inc..*, 113 F.3d at 381*; see also Yurman Design, Inc.*, 262 F.3d at 117 ("[W]ithout a specification of the design features that compose the trade dress, different jurors viewing the same line of products may conceive the trade dress in terms of different elements and features, so that the verdict may be based on inconsistent findings.").

Thus, "the mere attachment of brochures [and] photographs . . . to the Amended Complaint" is not sufficient, "as courts cannot be expected to distill from a set of images

those elements that are common to a line of products and both distinctive and non-functional." *Nat'l Lighting Co., Inc. v. Bridge Metal Indus., LLC*, 601 F. Supp. 2d 556, 562–63 (S.D.N.Y. 2009).  Given that Oban has failed to plausibly allege a trade dress infringement claim, Nautilus' motion to dismiss is granted as to Count Four.

### D.    Unfair Competition (Count Two)

Oban only perfunctorily addresses its claim for unfair competition under the Lanham Act and unspecified states' statutes, contending that "Sports Beat (and by extension Bowflex/Nautilus . . .) copied Oban's product without authorization, infringed Oban's trademark, copyright and trade dress," and the "public has been deceived."  (Pl.'s Opp'n at 6.)  To the extent that Plaintiff asserts a separate claim in Count Two for unfair competition under Section 43(a) the Lanham Act, it is dismissed for the reasons discussed above regarding Plaintiff's trademark infringement claims.  Section 43(a) prohibits the "use[] in commerce" of "any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact."  15 U.S.C. § 1125(a).  "As the Second Circuit accurately observed . . . 43(a) 'does not have boundless application as a remedy for unfair trade practices,'" *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 29 (2003) (quoting *Alfred Dunhill, Ltd. v. Interstate Cigar Co.*, 499 F.2d 232, 237 (2d Cir. 1974)), and "'because of its inherently limited wording, § 43(a) can never be a federal codification of the overall law of unfair competition' but can apply only to certain unfair trade practices prohibited by its text," *id.* (quoting 4 J. McCarthy, *Trademarks and Unfair Competition* § 27:7 (4th ed. 2002)).

Plaintiff must allege grounds for attributing Sports Beats' infringing "use" of Oban's trademark to Nautilus, *see Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421, 1433 (3d Cir. 1994) ("In construing the [Lanham] Act . . . courts routinely have recognized the propriety of examining basic tort liability concepts to determine the scope of liability."), but has not alleged anything more than Nautilus' duties and authority as a licensor which cannot establish liability, *see Display Producers, Inc. v. Shulton, Inc.*, 525 F. Supp. 631, 633 (S.D.N.Y. 1981) ("The mere allegation that Shulton provided Ledan with the opportunity to engage in wrongful conduct [by providing it with a product] does not, without more, state a claim for contributory infringement under the Lanham Act."); *see also Optimum Technologies, Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1243 (11th Cir. 2007) ("[T]here is no evidence that *HCA* itself 'misused' the Lok–Lift mark, that is, that it 'placed' the Lok–Lift mark on 'goods' or 'displays' at the level of the retail stores.").

As for Plaintiff's unfair competition claim asserted under "the various state unfair competition acts," in the absence of any other state statute identified, the Court will assume that Plaintiff has asserted a claim under the Connecticut Unfair Trade Practices Act ("CUTPA"). Like Plaintiff's Lanham Act unfair competition claim, its CUTPA claim is based on Sports Beat's copying of its "product without authorization" and infringement of Oban's trademark and copyright; Nautilus is alleged to be responsible for this conduct only "by extension." (Pl.'s Opp'n at 6; *see also* Am. Compl. ¶ 28.) As discussed above, however, there is no basis for attributing such conduct to Nautilus and as a result, Plaintiff's CUTPA claim is dismissed as well.

### III.    Conclusion

For the reasons set forth above, Defendant Nautilus' Motion [Doc. # 22] to Dismiss is GRANTED. The Clerk is directed to dismiss Defendant Nautilus from this action.

IT IS SO ORDERED.

_____/s_____
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 23rd day of June, 2014.